**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

X_____X

**IN THE MATTER OF THE EXTRADITION**
**OF ALEX SUYANOFF, A/K/A  AS  AMNON**
**MORDAHAEV.**

X_____X

**COMPLAINT No. 12 M 462**

_____
_____

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S**
**OBJECTIONS TO HIS**
**EXTRADITION TO BRAZIL PURSUANT TO T. 18, U.S.C., SECT 3184**

_____
_____

Michael S. Washor, Esq.          and          Robert P. Leighton, Esq.
145 E. 16th Street, Suite 20-F                 132 Nassau Street, Suite 900
New York City, N.Y. 10003                      New York City, N.Y.  10038
(212)-533-3814                                 (212)-267-6019

Attorneys' for Petitioner Alex Suyanoff, A/K/A  Amnon Mordahaev

# EXHIBIT LIST

| EXHIBIT | SUBJECT |
|---|---|
| A. | Brazilian Trial Attorney Froim Icek Baumwaul-Affidavit |
| B. | Brazilian Paralegal Attorney Sonia S. Leao-Affidavit |
| C. | Brazilian Paralegal Attorney Sonia S. Leao-Notes |
| D. | Western Union Receipts: Extortion Payments for Release from Brazilian Hospital |
| E. | Photograph of Petitioner's Colostomy Wounds |
| F. | Bolivian Attorney Oswaldo Martorell |
| G. | Newspaper Article: Petitioner's Escape from Brazilian Hospital and Arrest of Police |
| H. | Newspaper Article: Petitioner's Kidnapping in Caracas, Venezuela |
| I. | Bangu Prison Conditions-Ms. Simoni Silva |
| J. | Bangu Prison Conditions-Ms. Christine Batista Silva |
| K. | Bangu Prison Conditions-Ms. Carmella Andrade |
| L. | Formal Extradition Documents: Trial: Verdict: Appeal: |
| M. | Dr. Fabian Barja P. Bolivian Hospital |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
X_____X

IN THE MATTER OF THE EXTRADITION        PETITION
OF ALEX SUYANOFF, A/K/A  AS  AMNON     12 M 462
MORDAHAEV.
X_____X

We submit this memorandum of law in support of Petitioner's objections to his extradition to Brazil. For clarity purposes, we set forth the chronological sequences of events that precipitated the present extradition proceedings; likewise, follows an explanation and statement of facts which accompanies the case precedent supporting the objections to his extradition to Brazil.

## 1-BACKGROUND AND INTRODUCTION

Alex Suyanoff was born in Uzbeckistan, Russia, on March 05, 1951 and is presently 61 years old. He immigrated to the United States seeking political and religious asylum and afterward became a United States citizen. He travelled back and forth to Israel where he met and married Elana Chaim who bore him two children, a daughter, now 32 years old and a son, now 31 years old.

In 1994, Alex Suyanoff, (Alex), as a naturalized United States citizen who was convicted in Brazil of Conspiracy to violate the narcotic laws of that country and sentenced to jail; after serving approximately four (4) years in jail, he was deported from Brazil in 2000 to the United States. While incarcerated in Brazil his mistress had a child as a result of conjugal prison visits.  Though separated thousand's of miles, Alex maintained a paternal relationship with his daughter after his deportation.

In 2003,when his daughter was about four (4) years old, he returned to Brazil to bring her back to the United States. It was at this moment of time that Alex was once again re-arrested by the very same police officer who arrested him in 1998 and charged anew with the Brazilian narcotic's conspiracy laws.

In order to appreciate the abuses and inhumane treatment suffered by Petitioner and the denial of his United States Constitutional rights from 2003 through 2007, (the second trial in Brazil) we trace Alex's journey through that arrest and that trial in Brazillia, his ordeal in Bangu prison, the development of his colon cancer, the colostomy operation in Rio De Janeiro hospital, the meeting at the United States Embassy in Bolivia and his ensuing arrest by Bolivian police, his court appearances in Bolivia, his travel to Caracas, Venezuela, his two operations in a Caracas hospital,his kidnapping by rouge police (officers) gangs in Caracas and his return to the United States.

We are presently before this court as a result of the Brazilian request for extradition from the United States. The Eastern District of New York obtained a provisional arrest warrant through a formal request, on May 10, 2012, from Brazil to the United States, via diplomatic channels. Petitioner was arrested on May 21, 2012 and remains in custody to date. There was no delay by Petitioner and on the 60th day of his incarceration, July 19, 2012, the government announced that the Brazilian formal documents were received by the State Department, in Washington, D.C.. Petitioner, through counsel, objected to a continuation of a hearing, arguing, that the court was without judicial power to extend the terms of a treaty; that by doing so, the court engaged in a conflict of interest usurping the jurisdiction of the Executive branch of our government; that by extending the time period of 60 days within which he was entitled to a hearing and release from custody, the court has further violated Petitioner's rights. These specific legal issues are not briefed in this memo nor are they waived either, but, rather, are to be addressed in a later proceeding.

## 2-TRIAL IN BRAZILIA: (2004)

We have submitted the affidavit of Froim Icek Baumwol, the attorney who represented Alex at his trial in 2004. Exhibit A, annexed. He sets forth facts that clearly delineate several violations of Alex's Constitutional Rights under the Laws of Brazil as well as under the United States' Constitution:

Against the background of legal precedent cited under caption "Discussion", below, we now focus on the trial of Alex Suyanoff in 2004 in Brazil and identify the violations of the United States Constitution that support Petitioner's objection to extradition.

First, the entire trial was conducted in Portuguese; Petitioner was not fluent in that language; he did neither speak nor understand the language of Portuguese, the vernacular language of the trial except for memorized social phrases. Attorney Froim Icek Baumwol, clearly states in his affidavit that this issue was brought to the attention of the presiding Judge, Maria Zelia Procopio, by requesting that an interpreter be assigned to translate the proceedings for Petitioner; this request was denied (as was subsequent requests by defense counsel to the presiding judge for the assignment and appointment of an interpreter); thus, Alex attended the three (3) hearings without an interpreter and without understanding the charges or the testimony or the evidence or the alleged statements made to the police by his co-defendants that were being offered against him. There were neither admissions made by Alex to the police nor any inculpatory statements made by him, what-so-ever, simply because, a) he neither fluently understood nor spoke Portuguese and, b), because he opined that any explanation made to the charges by him would be more effective if made in open court; thus, neither any statements nor any admissions were offered in evidence against him.

Second, during this initial hearing, the Judge made an in depth inquiry of Petitioner concerning his participation in the charges; i.e., who he associated with among the other co-defendants; what he did to further the conspiracy charges and what

was discussed concerning narcotics with his co-defendants. Petitioner told his counsel he did not understand the Judge's questions posed in Portuguese and again, requested an interpreter. This request was denied, once again.

Importantly, at this juncture of the proceedings, counsel Baumwol advised Petitioner that if he persisted in telling the court that he did not understand the court's questions because he was not fluent in Portuguese, she would infer that he was being deliberate and not responding purposely which would result in her assuming he was guilty of the charges. Thus, counsel Baumwol, standing behind the Petitioner as the court was questioning him, whispered his translation to Petitioner, in fractured Hebrew, and then advised the court of Alex's response in the vernacular Portuguese language. Petitioner's responses to the court's questions followed a pattern that unequivocally demonstrated his need for an interpreter: "*I do not understand the Court's question; that question is unclear to me; if I had an interpreter, I could answer the questions more clearly; I can not answer that question with out a complete explanation; I can not answer your question because I'm not sure what you mean*". This repartee was onerous to all parties and took a protracted time to complete. It was clear that the Judge's judicial attitude became overtly frustrated but she, was steadfast in her refusal to designate or appoint an interpreter.

Third, the court was told that Petitioner was fluent in English, Russian and Hebrew. His attorney could understand Hebrew slightly but could not fluently converse in that language. Counsel Baumwol was caused to stand behind Petitioner at the following hearings whispering a fractured translation of the proceedings in a language he was not himself fluent in. This interfered with Mr. Baumwol's focus on the testimony given by the police witnesses and his ability to subscribe notes of the testimony. Alex could not and did not participate in his defense. Likewise, both counsel and Petitioner were ineffective in their communications and had difficulty in reviewing any testimony and preparing a defense.

Thus, Petitioner's 5th amendment and 6th amendment United States Constitutional rights as well as his rights of confrontation and Due Process rights, were clearly and unequivocally violated. In effect he had no counsel representing him; nor was he aware of the witnesses' specific accusations; nor could he have cross-examined any of these police witnesses; nor could he have remained silent after receiving his counsel's advice. As attorney Baumwol's affidavit sets forth:

> "*I informed my client that he,......... would be questioned by the judge as to his knowledge of his co-defendants, his own participation in the criminal charges as well as his pedigree; I explained that if he did not respond to the Judge's inquiries and remained silent, she would assume that he was guilty of the charges.*"

Froim affidavit, exhibit page 1, paragraph 6

The second and third hearings proceeded in a like manner, with no interpreter present and effectively having no attorney to effectively represent him. This trial was equivalent to a trial *in absentia*. Alex could do nothing to defend himself at this stage of the trial.

Fourth, tape recordings were introduced into evidence through the police testimony; the recordings were in Portuguese and again, Alex was unable to understand or determine if his voice or any of his conversations were captured on tape. Surely, he was unable to identify any of the participants in the conversations nor assist his attorney accordingly. As well, the authorizations to employ tape recordings was derivative and, in the absence of being able to communicate with his counsel, there was no way to attack the legality of the wire tap evidence nor a method to attack the use of the conversations at trial. The prosecution attempted to over-come this legal hurdle by claiming that the cell phones belonged to the defendants who were conversing. What was conspicuously missing in evidence was any voice identification of Petitioner participating in any illegal drug conversation or transaction. The mere use of cell phone telephone numbers was an inappropriate method of substitution for identifying the participants in any of the wire conversation or even as participants in the charged conspiracy.

Fifth, Petitioner was not brought before the court for sentencing. Simply put, the Judge found him guilty and imposed a 16 year sentence *in absentia* without affording Petitioner his right to any sentence mitigation.

## 3- ANALYSIS OF THE TRIAL AND THE APPEAL DOCUMENTS PROVIDED TO THE COURT BY BRAZILIAN AUTHORITIES AS PART OF THEIR FORMAL REQUEST FOR EXTRADITION

This court has neither the legal authority nor the jurisdiction to re-try the case against our client as part of an extradition hearing. Nevertheless, we focus the court's attention on what can only be described as blatant, obvious and deliberate machinations of the trial Judge and police witnesses who, we believe, were focused on convicting our client at trial. It is our hope that this court will recognize the overt changes and the disparity in the testimony by both the trial court and the police witnesses that were designed to inculpate our client in the face of insufficient evidence.

To accomplish this onerous task, we reference first, the trial evidence that was neither obtained nor produced at trial.

There was a no admission of criminal conduct to the police by our client; there was no physical evidence of any illegal drugs found on the person of or at the home of our client; there was no statement by our client to the court acknowledging his participation in any criminal conduct related to the charged conspiracy to distribute cocaine; there was neither video surveillance of our client receiving money nor drugs in furtherance of any charge; while there were wire recordings and tapes made by police conducting an investigation prior to the arrests, there were no identification of voices on these recordings;

nor did the police identify the speakers in these conversations; there was no evidence that these wire interceptions and telephone conversations pertained to the distribution of drugs or any other illegal activity.

The evidence produced at trial to convict Alex consisted of the following:

First, police testimony that our client, while eating at a restaurant named "Bob's Snack Bar", received a "package simulating a parcel of money" (pages 8 & 9 of the translation of formal documentation); there are no documents that reflect any cross-examination of this police testimony. In fact, a trial transcript was never provided and we are left with guess-work and innuendo as reported and stated by the trial judge. There was no money produced at trial that equated to the police testimony of "simulated a parcel of money"; we do not know if the money was vouchered; we do not know if the money was counted; we do not know if an official police report was prepared at the time of the seizure; and, importantly, we do not know what happened to this "simulated parcel of money". We do not know if this "simulated parcel of money" was in Euros, U.S. Dollars or some other form of currency. We do not know what happened to this "simulated parcel of money".

Second, a Police Officer testified that quite near the site of the meeting, a GM/VECTRA car was located; in the back seat of this automobile there was cocaine and a women's purse that belonged to a person named MARLUCIA, another arrestee. (page 10 of the translation of formal documentation).

Third, another Police Officer testified, corroborating the seizures from the GM/VECTRA automobile; and that a kilo of cocaine was found in the back-passenger seat, underneath the driver's seat, along with a purse belonging to MARLUCIA, one of the arrestee in the restaurant; a brick kilo of cocaine was found in her purse; the information in her purse, contained identification documents reflecting that the purse was hers and the other documentation showed her ownership of the GM/VECTRA; (pages 9 & 24 of the translation of formal documentation). This testimony corroborated the first Police Officer's account of what he found after the search of the automobile.

Fourth, after the search of MARLUCIA's home and finding scales and other drug paraphernalia, the police returned to the precinct. They brought MARLUCIA's son with them. They explained that he would be arrested and charged because of the drug paraphernalia found at their home. The police actually beat him in the presence of MARLUCIA. This conduct precipitated MARLUCIA's cooperation with the police and upon their suggestions, she then implicated Alex Suyanoff as the leader of the cocaine conspiracy and that the GM/VECTRA, containing the kilo of cocaine, was actually his automobile; and she agreed to cooperate with the police, further.

Fifth, at trial, MARLUCIA recanted her statements made to the police at the precinct. She explained that she signed the statement only to curtail her son's beatings by the police; that her only benefit for her cooperation was that her son would be let go and not charged with the cocaine conspiracy. (page 20 of the translation of formal documentation). She explained that she would say whatever the police wanted her to say upon the threat of their continued beating of her son.(pages 31, 33 & 44 of the translation of

formal documentation); she signed a statement for the police saying that the GM/VECTRA and everything in the car belonged to "Alex". In court, before the Judge and under oath she admitted that her police statements were lies and were coerced by the police. She acknowledged, before the Judge, that after signing the police statements, the abuse and threats ended and the police let her son leave the precinct without lodging any charges against him.

Sixth, at trial, MARLUCIA testified that several months prior to her arrest she had lunch with Alex; afterward, he travelled by bus to some other destination and she and her husband were later stopped by the police while driving her GM/VECTRA. She explained that the police confiscated the GM/VECTRA from her for their own personal use; that this occurred in late July, 2003. (pages 37 & 44 of the translation of formal documentation). She also told the Judge, under oath, that she had met Alex in the year 2000 and was neither aware he was in the drug business nor that his common law wife, Maria Argentina, was a drug mule. (page 30 of the translation of formal documentation).

In sum, the actual facts implicating Alex in the drug conspiracy were, at best, sparse. All the police had was mere presence by Alex. Simply put, there was insufficient evidence to connect our client as a participant in a cocaine conspiracy. They found no drugs on his person nor in any premises occupied by him; there were no admissions by him that he was involved in a drug conspiracy; there were no discernible taped conversations implicating either directly or indirectly Alex being a part of the conspiracy. All these facts were known by the police authorities, back at the precinct while processing all the arrestees. Thus, the police realized, at the precinct that there was no provable case against Alex.

Against this background, the police became mundanely creative and developed and presented the coerced statements of MARLUCIA. They knew there was no provable case against Alex without some link to connect the drugs to Alex. They believed the connection link was through MARLUCIA and her statement given to the Police at the precinct. Of course, the police were unaware that MARLUCIA would tell the truth at the trial, testify about the police beatings of her son, admit in open court to her false statements to the police at the precinct. Simply put, the police case had fallen apart by MARLUCIA's "blowing the whistle" on the cops at trial.

However, the destruction of the prosecution's case was resurrected by the trial Judge in her fact-finding decision. The judge knew that Alex and Maria Argentina were living together as common-law spouses. She reasoned that if she determined Maria Argentina to be the person who owned the purse containing the kilo of cocaine in the car that would be the logical nexus to Alex. The judge states in her written decision (73) the following:

> **"Nothing is more certain, however, than the fact that Maria Argentina, in the night of the arrest, was the person who had direct possession of the cocaine and kept it in her purse, put behind the passenger seat of the VECTRA car in which brought from the bus station to Bob' snack bar located in Copacabana...."** Emphasis added.

In the face of the testimony from two police officers that the purse contained documents clearly establishing that the purse and its contents (the kilo of cocaine) belonged to MARLUCIA, and coupled with MARLUCIA's admissions that the purse with the cocaine were hers, how can there be any rational justification for the judge's finding that the purse and the cocaine belonged to Maria Argentina! Simply stated, two Police Officers found evidence that definitively contradicted MARLUCIA's testimony at trial but supported her coerced statements to the police upon her arrest. the government cooperating witness' admission that the drugs belonged to Alex

This leap of fact finding should shock the conscience of every Federal Judge. There is not one iota of evidence, i.e.,wire recordings, police testimony, cooperating witness testimony, nor admissions by any of the defendants that can justify the Judge's conclusion that both the GM/VECTRA auto, the purse found in the back-seat of the auto or the cocaine in the purse belonged to Maria Argentina. However, in the face of this contradicting evidence, it appears that the only conspiratorial link to Alex was through Maria Argentina, his common law wife.

Even the appellate process was a distortion of fact and logic. The appellate judge blind-sided a major issue, to wit, the denial of Due Process. The core of the Due Process issue was that Alex Suyanoff was effectively tried *in absentia*; that throughout the trial hearings, he and his counsel, requested, on several occasions, that a Portuguese interpreter be appointed or assigned to help the defendant clearly understand the charges against him; to clearly understand the testimony being offered against him; to assist in the preparation of his defense and, to cross-examine and question the police witnesses. The trial court continually denied these multiple requests.

Just as importantly, his attorney Froim Baumwaul, petitioned the Court for an interpreter so as to allow him to focus on his function as trial counsel; he explained to the court that he could not render appropriate legal advice and consult with his client about a defense and examine witnesses while he was compelled to act as Alex's interpreter and simultaneously translate the proceedings for him. Again, these several requests were denied by the trial court.

On appeal these issues were identified and briefed and submitted for appellate consideration. Against this background, the first consideration is that a person extradited to a foreign nation can generally seek only the protection that nation affords, and in this instance it was an appeal to the Court of Justice of Rio de Janeiro. The defendant's appeal brief clearly referenced and cited the statute compelling the appointment of an interpreter for the defendant on trial when he is not fluent Portuguese. The Statute states, in pertinent part:

*"FOREIGN DEFENDANT-TRANSLATOR-LACK OF*
*APPOINTMENT-ANNULMENT OF PROCESS"*

*"Foreign defendant that does not understands Portuguese. Need of interpreter for all actions executed in the presence of the defendant. Judge, even speaking the defendant's language, cannot act as interpreter, due the limitations provided by Articles 277 and 281 of C.P.P. The judge cannot, even if [he] knows the foreign language, act as interpreter, thus shall appoint a translator, subject to the procedural rules, which prevent the self-appointment. He shall attend the hearing and witnesses hearings, when the defendant, hearing them, may provide his attorney about any eventual possibility of controversy or amendments in reporting the facts. The defendant, if he does not speak our language and does not understands the witnesses, due to the lack of a translator, is being prevented to exercise the constitutional full defense right."* See, Article 193 of CCP. "

The appellate judge concluded that Alex was in fact fluent in Portuguese; he made this determination from the police statements obtained by the police at the precinct (pages 112, &115 of the translation of formal documentation). This constitutes another leap of fact and logic and contradicts the evidence produced at trial.

At trial, police testimony established that Alex made no statement to the police; no statements were therefore offered in evidence. We do not dispute that Alex could respond to pedigree question in the vernacular trial language of Portuguese (pages 16 &17 of the translation of formal documentation). Surely, being capable of responding to your name, address, date of birth, marriage status, number of children, etc., in a foreign language does not make you fluent in that particular language.

It appears that the reasoning power of both the trial court and appellate court leaves a lot to be desired intellectually. Their respective conclusions that our client understood the testimony of the witnesses against him and the legal rulings published by the courts would not survive the "Ha Ha Tests" in our Judicial Jurisdiction. This statement is meant to be facetious since it appears that all parts of the whole criminal justice system of Brazil was focused on convicting our client. Simply stated, the police, the trial Judge and Appellate Judge were the conductors jointly operating the railroad train to Bangu prison for our client. We have not yet determined why a Portuguese interpreter was appointed for Alex's appellate process when he was not present for the appeal but yet no interpreter was assigned for the trial where Alex was present!

With all this gamesmanship, the appellate court while affirming the conviction, reduced Petitioner's sentence from 16 to12 years.

## 4-THE INHUMANE AND PHYSICAL ABUSES SUFFERED BY PETITIONER
### BRAZILIAN HOSPITAL

While serving approximately four (4) years in Bangu prison, Alex developed

colon cancer. We suspect that the inhumane and despicable prison conditions contributed to his cancer disease. Sonia Saraiva Leao, another Brazilian attorney, who represented and assisted Alex in his post-conviction status, stated in her affidavit, exhibit B annexed, in pertinent part, that:

> "When I first visited with Mr. Suyanoff, he was quite ill and was not receiving any medical attention while in prison. There was no physician available or on call associated with the Bangu prison. All he received during his illness was simplified medications, for headaches and muscle distress. His physical condition was deteriorating quickly; his stomach was severely extended; he had not been able to eat over 40 days; nor could he relieve himself over that period of time; he was listless and communication increasingly became more difficult over that period of time. I felt very sorry for him and believed that he was going to die if a doctor in a hospital didn't examine him immediately. I brought herbal medicines on my visits with him to try to help him with his pain. He couldn't walk and was caused to remain in a chair."

Demonstrative of the inhumane conditions and the abuses suffered by the petitioner in leaving Bangu prison for the hospital in Rio De Janeiro, attorney Sonia S. Leao, in her affidavit describes Alex's trip:

> "It took several days to obtain a vehicle to drive him to the hospital and finally, the prison officials sent a broken-down old ambulance with no stretcher or medical supplies for the trip. Mr. Suyanoff was tied and bound with strap-ropes to a chair in the back of this vehicle; I saw him falling sideways many times during the trip."

Alex remained in the hospital for several months after receiving a colostomy operation. During his post-operative period, he did not receive any chemotherapy, radiation or other cancer preventative medication. The hospital was not equipped to handle these serious procedures. In fact, the hospital ran out-of colostomy receptacle bags and Alex was caused to wash the dirty unsanitary "bags" himself and reuse them.

The police guarding Alex wanted to return him to Bangu prison on three (3) occasions causing his attorney, Sonia S. Leao, to make several applications to the court to delay his return to the prison until the hospital physician declared his surgical rehabilitation complete. This procedure spanned several months; all the while, Alex was not only confined to hospital bed but each hand was hand-cuffed to the bed-sides.

After his three (3) month recuperative stay at the Brazilian hospital, in July, 2007, having neither received any cancer medications nor any cancer rehabilitation treatments, Alex woke one morning to find his hands uncured and, literally just walked out of the hospital and traveled to a friends home in Bolivia. This awakening was not merely coincidental nor magical. The Police were becoming restless and frustrated with the repeated applications by Alex's attorney, Sonia S. Leao, to the court to maintain Alex in the

hospital until his recovery and rehabilitation was complete. Thus, these Police Officers extorted Alex and his family by demanding a large sum of U.S. Dollars to allow him to freely leave the hospital. Simply stated, they victimized both Alex and his family threatening to return him to Bangu prison with or without the court's imprimatur of approval. Once again, Alex became a victim of the wide spread corruption of the police in Brazil. See, Annexed exhibit C, wire receipts for the months of May, 2007, June, 2007 and July, 2007.

## BOLIVIAN INCIDENTS

The following day, he and his brother went directly to the United States Embassy in Bolivia, seeking asylum and assistance as a United States citizen. They described Alex's ordeal to Consular Rhea Borda, including the nature of the trial; he physically showed the Consulate his surgery wounds that had not yet healed and sought a United States Passport so he could return to the United States and receive proper medical attention. He explained that he was quite ill and had grave difficulty walking and traveling. See, photograph, exhibit D annexed. Consular Rhea Borda assured both Alex and his brother that she would help him in every way possible.

However, as he was leaving the United States Embassy in Bolivia that day, to await the assistance of and the receipt of medical attention, he was arrested by the Bolivian Immigration Police. We believe that the Consulate had surreptitiously contacted the immigration police and set-up Alex's ensuing arrest. This conduct by the United States Embassy in Bolivia is not only despicable and demeaning to our government, but as well, sends a loud and clear negative message to all United States Citizens seeking our [their] country's protection for asylum in a Foreign country; as well, it demonstrates that our own ambassadors are not to be trusted and relied upon. Further, there was a negative effect on the Bolivian attorney who stated that there was "*the lack of effective attention by the government of the United States, to preserve the juridical health and safety of its citizens in this case specifically.*"

Alex was further detained by the Bolivian police for several days at a temporary holding facility while in police custody.  There he received no medication and was becoming physically weaker and weaker. He was examined in jail by a Dr. Okubo who assisted Alex in a Habeas Corpus proceeding before Hon. Judged Dr. Zenon of the Bolivian court. The physician was profoundly worried that Alex was in critical condition and advised all parties that unless he received immediate medical attention he would die. His new Bolivian attorney, Oswaldo Martorell-hired by Alex's family- advised both the prosecutor, Raul Rosales and the Judge, Dr. Zenon, of Alex's condition as supported by Dr. Okubo. Mr. Martorell, stated in his affidavit, annexed as exhibit E, :

> "…..at the hearing before the Honorable Judge the Tenth Instructor
> in Criminal Matters, Dr. Zenon no. 0041/07, the prosecutor in charge,
> Raul Rosales for this case, on the afternoon of August 2, 2007, in an
> interim hearing, the Judge established the provisional suspension of
> preventative detention, for a period of 7 days, while carrying out medical
> attention to Mr. Alex Suyanoff, who stayed hospital;zed and under police
> custody in the clinic "Christ" in this city, in front of the police officers of

> *Interpol, which withdrew due to the action of "Resources of Habeas Corpus,*
> *since there they had to give medical attention."*

Put simply, the court directed that Alex be hospitalized immediately, adjourning the case for a further medical report from the hospital.

Alex was examined by several physicians while hospitalized in Bolivia. He was advised that the first operation in Brazil was not properly performed and in the absence of a new procedure, he would in all likely expire. This Bolivian facility, "Christ" hospital, could not perform the necessary surgery to correct the medical problems. As well, they could not administer either chemotherapy or radiation treatment to curtail or arrest his prevailing cancer. The doctors told him the best facility was in Caracas, Venezuela or in Cuba or back in the United States. See, Dr. Fabian Barja P.'s affidavit, annexed as exhibit F.

At the next court appearance, on August 7, 2007, Judge [Dr.] Zenon, in consultation with the examining physicians, the prosecutor Raul Rosales, Alex's attorney, Osvaldo Martorell, and after reviewing the medical reports, ordered the freedom "*to Mr. Suyanoff with the commitment [ personal guarantee] of two people who care and ensure compliance if necessary when needed.*" See, Oswaldo affidavit, exhibit E.

Alex was last seen by his Bolivian attorney immediately after Judge [Dr.] Zenon ordered his freedom on August 7, 2007. Counselor Martorell states that:

> "*he was scared and feared for his life, and he did not know who to trust*
> *anymore; he did not know what to do or where to go for medical care; he*
> *was very ill and had not received chemotherapy for the cancer he was*
> *suffering [nor] proper medicine; he needed a suitable hospital where he*
> *can get a better health care for corrective surgery for abdominal and*
> *possible reversal of the colostomy.*"

Oswaldo Martorell affidavit, exhibit E.

As evidenced from the discussions between the physicians, the Judge and the review of the medical reports presented in court, it was recommended that he would only receive good medical care "*in Cuba or Caracas, where they have equipment for chemotherapy to treat advanced cancer that he was suffering from; and, by staying here he would not receive such good treatment he would run the risk of infecting himself again and be at risk of lowing his life.*"

## CARACAS HOSPITAL

After several days of recuperation from the strain of being moved to and from jail to the hospital and back and forth to court, Alex next travelled to the recommended hospital in Caracas, Venezuela where he received the needed medical assistance and treatment. He could not return to the United States to seek medical assistance because, first, he had no United States passport and second, his physical condition was rapidly declining. Worried that the Brazilian authorities were actively looking for him, he feared checking into the hospital under his real name. There were television reports and newspaper articles and

photographs describing his flight from Bangu Prison and the hospital in Brazillia- indeed he was a "wanted" man on the run from justice. Thus, using some caution, he entered the Hospital de Clinicas Caracas, under the name of Krikor Apovian Levon because of his native tongue, Russian. After having been falsely arrested by the Brazilian police and "fooled" by the American consulate office in Bolivia believing they would help him, only to be arrested by the Bolivian police and again, back in custody, he was becoming paranoid.

It must be remembered that he and his family were extorted by the Brazilian Police and complied with their demand to pay them in U.S. Dollars to facilitate his release from the hospital rather than being returned to Bangu Prison.

The first operation in the Caracas hospital corrected the surgical errors made in the Brazilian hospital. Alex received the appropriate medical attention usually associated with cancer surgery as well as the appropriate medication focused on his recovery. While recuperating from this second surgery, his real name and photograph once again, surfaced in the news media depicting him as a cartel drug-lord who headed the Nigerian connection and who escaped from a Brazilian prison. The media carried the news story of the Police Sergeant who, while guarding Alex in the hospital, was arrested and eventually convicted and incarcerated for facilitating an escape for Alex. The news media exaggerated Alex's status as an international drug dealer and maximized Alex's escape from the hospital as a bribery; the truth is that he was extorted by corrupt police officers and victimization once again as an extortion target. See, annexed exhibit F.

## THE KIDNAPPING IN VENEZUELA

Within a month, the doctors once again operated on Alex: they performed a colostomy reversal which appeared to be successful. When his recovery was finalized, leaving the Caracas hospital, Alex was kidnapped by local police; they demanded a ransom and Alex contacted his family once again. This was a new and separate extortion scheme. This cabal of four (4) kidnappers were all Caracas Police Officers working in a specialized team of law enforcement. When the ransom was paid, the kidnappers were arrested immediately and the thousands of euros were confiscated by the local police. The kidnappers were all policemen from a special squad in Caracas. The media published this incident with a furor and the four (4) policemen who participated in the kidnapping were dismissed from the police force and charged with a plethora of crimes. See, annexed exhibit G.

At this point, Alex clandestinely made his way back to the United States, to his home and family in Brooklyn, New York. The kidnapping escalated his fears; First, he never bribed any police Sergeant to leave the hospital but rather was a victim of corrupt police extortion; at least one of those officers was arrested and convicted of facilitating the escape from prison. Alex was in fear for his life. Second, the four (4) specialized police officers that kidnapped him were likewise incarcerated for their criminal conduct and Alex was told that they believed he set a trap for them.

It was against this background, that Alex legally changed his name through an attorney here in the United States as a precaution against any of the Brazilian and Caracas

police seeking retaliation against him or his family.

He firmly believes that the only reason he initially survived his period of incarceration was that he was ill for several years; yet, he lived in fear of bodily harm because he was not fluent in Portuguese and had great difficulty understanding and communicating with the inmates. He is convinced that he will be killed if he returns to a Brazilian jail because of the collateral damage caused to the Brazilian police who lost their pensions, their jobs and received jail sentences for several years; likewise, he believes the police are all aligned with one another from country to country in South America and should he be returned to jail, then the police who kidnapped him will retaliate by killing him.

## BANGU JAIL

At the outset, we acknowledge that the usual issues of humaneness in treating prisoners who are incarcerated in foreign jails rests within the discretion of the State Department of our government. However, we are hopeful that some day Congress will revisit this issue and recognize that penalty enforcement and the mistreatment of convicted prisoners is an important facet of civility in our system of jurisprudence. Would a court sanction the return of a prisoner to Camp Auschwitz ? We think not ! Subjecting a prisoner to draconian jail conditions where health issues are sub-human and prisoners are invaded daily by all types of diseases and there are no medical facilities nor attending physicians is equivalent to a death camp. There should be appropriate inquiry by our judicial system in to violations of a citizen's civil rights by foreign governments. Put simply, a government that condones "torture", "physical mistreatment of prisoners" and allows sub-human conditions to pervade its penal system facilities can not engender trust, reliability and confidence that Due Process as promulgated by our Constitution, has been accorded to our citizens who have violated foreign laws.

Thus, we present cursory examples of the mistreatment of our client through his ordeal with law enforcement while in the prison systems of these South American countries. The rhetorical question is posed: how can an American Judge have confidence in the stability of the judicial processes of a foreign nation that not only has not curtailed "torture" and "physical abuse" in its prisons and by law enforcement personnel over decades but allows it to continue functioning with those same abuses?

The Attorney, Sonia Saraiva Leao, who serviced her clients in Bangu Prison for many years and who visited with her clientele for more than a decade describes the jail conditions when she met Alex as follows:

> "The jail conditions in Bangu prison were despicable and horrible;
> it was infested with mosquitos and other vermin. I can only describe
> the accommodations of this prison as equivalent to living in a sewer.
> The odors were most offensive and the prisoners I have seen were living
> like caged animals, including Mr. Suyanoff."

The conditions in Bangu Prison where Petitioner was incarcerated, were and remain draconian; it was infested with disease and vermin contributing to a convict's development of respiratory illnesses, i.e. like tuberculosis and pneumonia, hepatitis, venereal infections and AIDS. Amnesty Investigations, Inc., have established that 20% of all Brazilian prison population was infected with HIV-due to homosexuality, sexual violence perpetrated by other prisoners and the use of illegal (injected) drugs. As well, it was found that a large number of inmates had mental disturbances, cancer, leprosy, and physical paralysis defects. Likewise, the only dental and odontological treatment rendered by the prison was and still is confined to tooth extractions. See, Affidavit of Simoni Ferrera Silva, Exhibit H, annexed.

The Amnesty Organization investigation reported that there were no medical or hospital treatments available in these prisons; simply put, Bangu Prison as well as most other penal institutions in Brazil demonstrates and exemplifies non-compliance with the Brazilian Law of Penal Execution, item VII of the article, which specifically grants health rights to all convicts and constitutes a state obligation. More simply stated, Petitioner, et al, had been incarcerated in despicable prison health conditions and developed a deplorable state of health (stomach cancer); he was not able to eat nor ingest liquids after a while; most importantly, because of the tumorous blockage of his intestines, he was unable to evacuate which accelerated his cancer growth. Eventually, after more than 40 days of neither ingestion of food nor evacuation he was removed to a Brazilian hospital where he underwent an unsuccessful colostomy operation.

The affidavit of Maria Evania DeSousa Andrade, once an inmate of Bangu Prison, demonstrates the inhuman and inhumane prison conditions in Bangu Prison. See, Exhibit F, annexed. She states, in pertinent part:

> "*Prisoners, here in Brazil, are treated with total neglect and abandonment by the authorities. They suffer all types of physical and moral humiliation. Not to mention the terrible conditions of hygiene, since the cells are overcrowded, a deplorably dirty environment, which I used to call a "dump for excluded humanity".*

> " *.......corruption among the prison personnel is very common. I myself saw several people die without treatment who had heart conditions, pulmonary conditions, HIV and cancer, and those were not isolated cases, there were several. Help only arrives after the prisoner is already dead then they call the family and say they could do nothing. As to dentists, only if they are going to extract teeth.*

> *In summary, it is precarious, cruel and inhuman, there is only one*

> sure outcome for someone who needs medical treatment, they will
> die."

The affidavit of Carmella Silva de Andrade, Exhibit G, annexed, consisely sums up the Bangu Prison conditions:

> "*The situation here is one of total neglect and abandonment. The prisoners live in overcrowded cells without the slightest conditions of hygiene, alimentation and medical attention.*
>
> *For this reason the vast majority of the prison population has lung problems such as tuberculosis, other [illnesses] like hepatitis and even cancer, there are no privileges [human rights] for any type of invalid, there is no isolation for those with contagious infective diseases. People are taken to the hospital when nothing more can be done. It is one more means of punishing and humiliating the families and the detainees.*"

## 5-DISCUSSION

This case raises serious questions of law and fact concerning the the United States obligations pursuant to an extradition treaty and the courts' role in ensuring that a citizen, Alex Suyanoff a/k/a Amnon Mordahaev, petitioner above, is [was] treated fairly. A correlative expansion is required in [our] courts' power to insure that those to be extradited are and were granted due process and are or were treated humanely. See opening paragraph, Weinstein, District Judge, No. 89-CV-715, Sept. 26, 1989, Ahmad v Wigen, 910 F.2d 1063 (2d Cir. 1991). Thus, Petitioner seeks an evidentiary hearing to present evidence establishing that, I) he was not afforded due process at his trial and appeal therefrom; II), that his basic and fundamental constitutional rights as a United States citizen were abridged and violated persistently during the trial; III) that in essence his trial was equivalent and tantamount to a trial *in absentia;* IV)that the totality of all these fundamental constitutional violations were paramount to a total denial of due process; V) that he was not treated humanely while serving a jail sentence; and, VI) that there is no reasonable expectation that he will be treated humanely, *in futuro,* if returned to Brazilian custody or a Brazilian jail.

Petitioner's claims raise the issues of whether a federal court may inquire into the fairness of the Brazilian government's criminal justice system, including whether the modus of his trial and rules of Brazilian law violated Petitioner's constitutional rights when, first, the interrogation by the Judge (the trier of the facts,-there are no jury trials in Brazilia) violated his 5th amendment right of silence by commanding him to respond to factual questions related to the criminal charges; second, the violation of the 6th amendment, denying his right to competent and effective counsel to represent him when there was no method of fluent communication between his attorney and himself and, he

could not aide his counsel in his defense; third, his right to due process was violated when the court refused to appoint an interpreter for petitioner during trial so that he could understand the proceedings and cross examine his accusers and present a defense; fourth, when Petitioner was sentenced *in absentia*, he was denied his right to mitigate his sentence; and, fifth, there was a clear and unequivocal violation of Due Process when considering and examining the totality of all these circumstances. These issues require an evidentiary hearing. Petitioner will demonstrate by a preponderance standard that he has [already] been abused and treated unfairly and inhumanely by the denial of his fundamental protection of his rights under not only Brazilian legal principles but also, pursuant to his rights under the United States Constitution. See, Ahmad v Wigen,726 F.Supp. 389.

In the case at bar, Alex Suyanoff faces both the "reality of liberty already lost" and the danger of [future] deprivation. Rosado v Civiletti, 621 F. 2d 1179. The facts parallel the case at bar; The Court found that the defendant[s], convicted after a trial in Mexico did not even receive the barest rudiments of a process calculated to arrive at the truth of the accusations against him. He did not receive the assistance of counsel during the Mexican criminal proceedings, nor was he ever accorded an opportunity to appear before the judge who sentenced him, he could not address the charges against nor present any evidence at all, there was no opportunity to confront the witnesses against him nor was there any cross examination allowed. The renown jurist, Hon. Judge Irving R. Kaufman, writing for the appellate panel teaches us the following:

> " we believe these petitioners have a right to test the basis for their continued confinement in a United States Court. In reaching this conclusion, we by no means imply that each element of due process as known to American criminal law must be present in a foreign criminal proceeding before Congress may give a conviction rendered by a foreign tribunal binding effect.
>
> We simply hold that a petitioner incarcerated under federal authority pursuant to a foreign conviction cannot be denied all access to a United States court when he presents a **persuasive showing** that his conviction was obtained without the benefit of any process whatsoever. United States ex reel Bloomfield, 507 F.2d 928. Having thus determined that petitioner[s] posses a right to challenge the basis for their confinement under United States custody, we must proceed to consider the merits of their claim….." Emphasis added

Today, it is becoming axiomatic that the United States Federal courts do not "assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." Jhirad v Ferrandia, 536 F.2d 478, 484-85 (2d Cir.) Demjanjuk v Petrovsky, 776 F.2d 583 (6th Cir. 1985). Importantly, and most emphatically, "neither can another nation use the courts of our country to obtain power over a fugitive [having] den [ied] that person of Due Process." Jhirad, supra, at 485 required the demanding state to show that petitioner would not be prosecuted for a crime where the statute of limitations had run.

In Gallina v Fraser, 278 F.2d 77, 79 (2d Cir.) the court expressed the opinion that extradition may be limited based upon the federal court's sense of decency. Put another

way, the holding suggests that a "*federal court's sense of decency*" may limit extradition. A Stanford Law Review article states it with more clarity: "*we can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency*", (*13 Stan. L. Rev. 370*) that extradition should be denied.

In re Extradition of Burt, 737 F.2d 1477 (7th Cir. 1984) the court reasoned that fundamental conceptions of fair play and decency as well as particularly atrocious procedures or punishments may be considered by the court in denying extradition. Plaster v United States, 720 F.2d 340, (4th Cir. 1983) held that "*violations of individuals' constitutional rights*" must be weighed and considered to determine if extradition would be "*fundamentally unfair*". In U.S. ex rel, Bloomfield v Gengler, 507 F.2d 925, (2d Cir. 1974) advises that extradition may well be "*antipathetic to a federal court's sense of decency*" and should be denied.

As the extraditing government, we are obligated to refuse to violate our own sense of individual justice. In Barr v United States Dep't of Justice, 819 F. 2d 25, 27 (2d Cir. 1987), the court stated in pertinent part:

> "*It is unquestionably the law that a treaty may authorize only such government action as is in conformity with the [our] Constitution*". *Reid v Covert, 354 U.S.1, 16-18; ( supremacy of the Constitution over a particular treaty)*
>
> *To determine whether our government is sufficiently involved in the actions of a foreign government so that a litigant in our courts who **has been harmed** by the actions of the foreign government **may successfully claim that he has been the victim of [a] constitutional violation[s]**,we have in the past looked to whether the actions of the foreign government were foreseeable and whether the refusal of the American courts to sanction them would deter inappropriate conduct by the American government in the future." U.S. Lira, 515 F.2d, 68, 71 (2d Cir.); U.S. ex rel Lujan v Gengler, 510 F. 2d 62, (2d Cir.)* Emphasis

supplied.

Put another way, our system of jurisprudence has continued to evolve where our Constitution may not require us to impose the details of our Constitution or procedural system on the requesting country's judicial system. On the other hand, it appears we have arrived at the stage where our courts are obligated not to extradite citizens who face[d] procedures or treatment that "*shocks the conscience*" of our judiciary within our current legal ethos. Rosado v Civiletti, 621 F.2d 1179, 1195-96 (2d Cir.)

Hon. Judge Jack B. Weinstein, in his decision, which appears to be a mini thesis on extradition procedures and principles, in Ahmad v Wigen, 726 F. Supp. 389, brought us to the point where a federal court may inquire into the fairness of a requesting country's criminal justice system, including its methods of

interrogation, rules of evidence regarding confessions and conditions of detention. If so:

> "the court must determine whether petitioner face[d]s treatment and procedures on extradition so offensive to the court's sense of decency that the habeas corpus writ must be granted and extradition prohibited".
>
> **"This court is empowered to hold an evidentiary hearing to determine the nature of treatment probably awaiting petitioner in a requesting nation to determine whether he..can demonstrate probable exposure to such treatment as would violate universally accepted principles of human rights."** Emphasis supplied.

While the Second Circuit Court of Appeals, in Ahmad v Wigen, 910 F.2d 1063, C.A. (N.Y.), 1990, affirmed Judge Weinstein's holding, they did delineate both disagreement and approval of several different issues.

The Circuit Court approved Judge Weinstein's holding, first, that the determination of whether an offense premising extradition is a political offense is an issue for judicial determination; second, that a Magistrate-Judge or District Court initial decision on an extradition proceeding is not appealable; third, the only remedy available to the government upon a denial of extradition was to seek a new complaint, *ab initio*, and the only remedy available to the accused upon the certification of extradition was to institute a Habeas Corpus proceeding. Simply put, an order granting or denying a section 3184 certification is not appealable.

The Circuit Court disagreed with Judge Weinstein's review of the laws and judicial proceedings of the requesting foreign nation holding that the Writ of Habeas Corpus was not the proper legal vehicle to review the laws and procedures of a foreign nation requesting extradition. Stated another way, the rule of non-inquiry applies specifically to Habeas Corpus proceedings.

What was most dispositive in the *Ahmad v Wigen*, supra, cases was that no restriction was imposed upon the Magistrate's function in an extradition hearing to determine the existence of probable cause as a basis for extradition. This, of course, proscribes an evidentiary hearing. Since the government posits that there was a conviction by a court in Brazil and with the Petitioner clearly demonstrating, by a preponderance of evidence through case precedents and affidavits that this conviction, by all standards, was equivalent to a trial *in absentia*, we believe that an evidentiary hearing in mandated to determine probable cause.

From this record, it is evident that Alex received a "railroad" conviction, or more colloquially stated, he was railroaded from arrest to jail for 12 years.  More vividly stated, his trial without an interpreter was tantamount to a trial *in absentia*. His physical presence at his trial was a mere facade of "fairness" and "justice". His attorney who could not fluently converse with him did not examine any witnesses at trial, nor discuss in detail any defenses Alex may have had, nor

did he submit any facts in mitigation of punishment at the time of sentencing wherein Alex was physical not present.

The established law of extradition implicitly recognizes that a trial *in absentia* is not likely to be a fair trial. Likewise, it appears that in the United States and most other countries, a person convicted *in absentia* is not treated as a person convicted, but rather as a person merely charged with criminal conduct.

> "This distinction must be based upon the belief that a conviction *in absentia*, unlike other convictions, is so unreliable that it is of no assistance in ascertaining the probable guilt of the accused. Such a belief receives support from the reported cases concerning extradition of persons convicted *in absentia* and from the feeling that one could hardly lack a reasonable doubt as to the guilt of an accused who had been given no opportunity to confront the prosecution witnesses or to present a defense."

13 Stan. L. Rev. 370 (1961) at 378.

The case of <u>Haxhiaj v. Hackman,</u> 528 F.3rd 282 instructs us that when the foreign conviction is [essentially] *in absentia*, then evidence beyond the fact of the foreign conviction itself, is necessary to establish probable cause. *See <u>Gallina,</u>* 278 F.2d at 78-79; <u>*Argento v. Horn,*</u> 241 F 258, 259 n.1 (6th Cir. 1957); <u>*In re Extradition of D'Amico,*</u> 177 F. Supp. 648, 651 n.3 (S.D.N.Y. 1959).

By and large, the precedents upon which <u>Haxhiaj,</u> *supra,* relies treat *in absentia* convictions as nothing more than charges of criminal wrongdoing, requiring the government to present proof from which the magistrate judge can make an independent assessment of whether probable cause exists. *See <u>Argento v. Horn</u>*, 241 F.2d 264, n.1.

The law is clear and unambiguous:

> *"Underlying the disparate treatment of a conviction rendered in absentia is the notion that* **"a trial in absentia is not likely to be a fair trial," affording the accused "no opportunity to confront the prosecution witnesses or to present a defense" and providing no real "assistance in ascertaining the probable guilt of the accused."**

*Emphasis added, See, <u>Foreign Trials in Absentia: Due Process Objections to Unconditional Extradition,</u>* 13 Stan. L. Rev. 370, 377(1961).

Petitioner's trial in Brazil parallels the trial in "Alice in Wonderland": "[S]he's guilty. Now let's have the trial." The Petitioner was not present at the appellate proceedings; he was serving his jail sentence in Bangu, a Brazilian prison reminiscent of 15th century castle dungeons. However, in its wisdom, the appellate court assigned an interpreter to be present during the appellate process. Rhetorically, for whom?

This is not a facetious comment. It is set forth demonstratively to highlight the facade of and want of due process accorded Alex Suyanoff in the Brazilian trial and in the Brazilian appeal. This is both outrageous and unconscionable; If this does not offend a United States Federal Court's sense of decency and fairness, what will?

*Barr, supra,* at n.2, teaches us that "*it is a recognized principle that, regardless of the degree of American government involvement in the conduct of a foreign sovereign,* **the federal courts will not allow themselves to be placed in the position of putting their imprimatur on unconscionable conduct**". *Emphasis supplied.*

## 6-CONCLUSION

We believe that the Brazilian trial of Petitioner, as well as the Brazilian appellate process was a sham and mocked the profound legal principles and mores of our Constitution. Further, we have "persuasively" demonstrated clear, unequivocal and concise constitutional violations of the 5th, 6th and Due Process amendments of the United States Constitution. Petitioner has already been exposed to draconian and unconscionable legal abuse and inhumanity at its zenith. Petitioner was not only victimized by corrupt law enforcement and an "Alice in Wonderland" justice system, but also was subjected to outright extortionate threats by Brazilian and Mexican Federal agents.

Extradition should and must be denied. In good conscience, our country in attempting to maintain legal, moral and diplomatic relations with other countries, can not blindly be the imprimatur of approval to those jurisdictions that perpetuate a facade of humanity and a facade of decency for the enforcement of human rights.

Respectfully submitted,

_____

Michael S. Washor  and Robert P. Leighton
Attorneys for Petitioner Alex Suyanoff a/k/a Amnon Mordahaev